IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Sarah Williams, | ) | C/A 2:13-304-RMG-WWD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Johnson & Johnson, Inc. a/k/a | ) | **Report and Recommendation** |
| Johnson & Johnson, Incorporated, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This employment discrimination case is before the undersigned United States

Magistrate Judge for a report and recommendation on the Defendant's Motion for

Summary Judgment. (Dkt. 27). 28 U.S.C. § 636(b).

The Plaintiff, Sarah Williams (Williams), brought this action timely on February 1,

2013, against her former employer, Defendant Johnson and Johnson, Inc., (J&J), in

which she asserted claims pursuant to the Americans with Disabilities Act, Act, 42

U.S.C. § 12112, et seq. ("ADA"), the Family and Medical Leave Act of 1993, 29 U.S.C.

§ 2601, et seq. ("FMLA"), and state contract law relating to the Defendant's employee

handbook.

The Defendant's motion for summary judgment was filed on March 28, 2014,

which presented the following grounds for judgment as a matter of law:

1. Plaintiff cannot establish the causal connection necessary to show a prima
facie case for several reasons and, thus, her claim fails.

2. Plaintiff cannot establish a genuine issue of material fact to establish a prima
facie case; that J&J's legitimate business reasons for her termination were false;
or that J&J's reasons were instead a pretext for FMLA retaliation.

3. Plaintiff cannot establish that she is a "qualified individual with a disability

1

which limits a major life activity" as is required by statute to bring her within the protections of the ADA.

4. Furthermore, even if she were covered by the ADA, she was not meeting J&J's reasonable expectations at the time of her discharge and there are no facts which raise an inference of unlawful discrimination the basis of a disability, much less that "but for" her disability she would not have been terminated.

5.  Plaintiff has not established any contractual obligation owed to her by the Defendant which the Defendant breached.

On April 24, 2014, the Plaintiff filed an opposition to the motion (Dkt. 35) and on April 30, 2014, the Defendant filed a Reply (Dkt. 36).  The case was reassigned to the undersigned on June 5, 2014.  Hence it appears consideration of the motion is appropriate.

## Summary Judgment Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir.1987).  "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." HealthSouth Rehab. Hosp. v. Am. Nat. Red Cross, 101 F.3d 1005, 1008 (4th Cir. 1996).  The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has made this threshold demonstration, the non-moving

2

party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324.  Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. Id.  Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' " in support of the nonmoving party's case. Thompson v. Potomac Elec. Power Co. ., 312 F.3d 645, 649 (4th Cir. 2002).  Rule 56 provides in relevant part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

## FMLA

The FMLA creates two types of claims: (1) interference claims, where an employee asserts that her employer denied or otherwise interfered with her substantive rights under the FMLA, see 29 U.S.C. § 2615(a)(1); and (2) retaliation claims, where an employee asserts that her employer discriminated against her because she engaged in activity protected by the FMLA, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave.").

Here, Plaintiff brought a retaliation claim because she argued that her employment with the Defendant was terminated because she took FMLA leave.

3

A retaliation claim under the FMLA is analyzed under the burden-shifting analysis that applies to a Title VII retaliation claim. See  Laing v. Federal Express Corp., 703 F.3d 713, 718–719 (4th Cir .2013); Dodgens v. Kent Mfg. Co., 955 F.Supp. 560, 565–566 (D.S.C. 1997).  Pursuant to this framework, the Plaintiff employee bears the burden of establishing a prima facie case, showing (1) she engaged in protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. Mercer v. Arc of Prince Georges County, Inc., 532 F. App'x 392, 398 (4th Cir. 2013).  Once a prima facie case has been presented, the employer has the burden of producing a nondiscriminatory reason for its actions. Id.  If the employer can produce a nondiscriminatory reason for its actions, the employee must demonstrate that the proffered reason is pretext for FMLA retaliation. Id. (citing Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001)).

The FMLA "does not protect an employee on leave from an adverse employment decision that would have occurred had she not taken leave." Thompson v. Spartanburg Cnty., 2007 WL 2477338, at 9 (D.S.C. Aug.28, 2007); see also Throneberry v. McGehee Desha Cnty. Hosp., 403 F.3d 972, 978 (8th Cir. 2005) (stating that "the FMLA's plain language and structure dictates that, if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge"); Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir. 2004) (finding that "[i]f dismissal would have occurred regardless of the request for an FMLA leave, however, an employee may be dismissed even if dismissal prevents her exercise of her right to

4

an FMLA leave").

## ADA

The ADA prohibits certain employers, from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." §§ 12112(a), 12111(2), (5), (7).  To this end, the ADA requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." § 12112(b)(5)(A).

The ADA defines "disability" to include "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(2).  A disabled individual is otherwise "qualified" if he or she, "satisfies the requisite skill, experience, education and other job-related requirements" and "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8); 29 C.F.R. 1630.2(m).

A plaintiff establishes a prima facie case of retaliatory discharge under the ADA if she demonstrates that: (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under

5

circumstances that raise a reasonable inference of unlawful discrimination. Harris v. Reston Hosp. Ctr., LLC, 523 F. App'x 938, 947 (4th Cir. 2013).

Attendance is an essential function of any job. Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 213 (4th Cir. 1994). (Plaintiff bears the burden of demonstrating that he could perform the essential functions of his job with reasonable accommodation). "It is well settled that an employer need not accommodate a disability by foregoing an 'essential function' of the employment position." Laurin v. Providence Hosp., 150 F.3d 52, 55 (1st Cir. 1998).

The Plaintiff must bear the ultimate burden of showing that "but for" the employer's intent to discriminate against her based on her disability, she would not have been terminated. Marshall v. AT&T Mobility, 793 F.Supp.2d 761, 765 (D.S.C. 2011) (ADA claims proceed under McDonnell-Douglas and Plaintiff must demonstrate "but-for" causation).

## Breach of Contract

Plaintiff alleged that the Defendant breached a contract of employment with her, which contract is based upon the Defendant's employee handbook. There is a presumption in South Carolina that employees are at-will. See Prescott v. Farmer's Tel. Co–Op., Inc., 335 S.C. 330, 516 S.E.2d 923, 927, n. 8 (S.C. 1999); cf. Perrine v. G4S Solutions (USA), Inc., No. 11–1210, 2011 WL 3563110, at 2 (D.S.C. Aug. 9, 2011); Amason v. P.K. Management, LLC, No. 10–1752, 2011 WL 1100169, at 6 (D.S.C. Mar. 23, 2011). Therefore, to survive a motion for summary judgment, Plaintiff must present evidence sufficient to create a genuine issue of fact that a contract for employment was created.

Under South Carolina law, for language in an employee handbook to create binding contractual obligations, the cited provisions or policies must be drafted in sufficiently mandatory terms to give rise to a reasonable expectation on the part of the employee of continued employment. See <u>Small v. Springs Industries, Inc</u>., 292 S.C. 481, 357 S.E.2d 452, 455 (S.C. 1987).  A policy or representation must limit the duration of employment or the employer's right to terminate employment in order to alter at-will status.  Other terms and conditions of employment, including pay, benefits, job duties, or location of performance may be changed prospectively by either party without violating an employment contract with an indefinite term.  A Plaintiff's claim that the Defendant violated the handbook's anti-discrimination policy does not save the breach of contract claim, as such policies have routinely been held not to, by themselves, constitute a contract. See <u>Ford v. Musashi S.C., Inc.</u>, 2008 WL 4414385 (D.S.C. Sept 23, 2008), adopting in part and denying in part, 2008 WL 4414497, at 3 (D.S.C. July 11, 2008) ("Under South Carolina law where an employee handbook provides a general policy statement of nondiscrimination such a 'provision does not constitute a promise altering the at-will employment relationship' "); <u>Fyall v. ATC/Ancom of South Carolina</u>,  2005 WL 2656962, at  4 (D.S.C. Oct. 18, 2005) (same); <u>Hessenthaler v. Tri–County Sister Help, Inc.</u>, 365 S.C. 101, 616 S.E.2d 694, 698 (S.C. 2005), citing <u>McKenzie v. Lunds, Inc</u>., 63 F.Supp.2d 986, 1003 (D .Minn.1999) and <u>Cherella v. Phoenix Technologies, Ltd.</u>, 32 Mass. App. Ct. 919, 586 N.E.2d 29, 31 (Mass.1992).

### Plaintiff's Allegations and Factual Background

The Defendant J&J is an insurance firm serving independent companies and

7

agents.  J&J writes a variety of personal and commercial lines, and Plaintiff Williams was hired in June 2002 as an underwriter for its home and auto insurance lines, until her termination on February 9, 2011.  J&J reported that Plaintiff was fired for poor performance, network/telecommuting issues, and because she was unable to maintain normal business hours. (Summary of Termination provided to South Carolina Department of Employment Commission, (Def. Ex. PP)).   Williams alleged that she was fired in retaliation for her having taken FMLA leave, because of her disability, and in breach of her contract of employment.

Williams had a burdensome sixty (60) mile round trip commute to work for seven (7) years until she accepted J&J's offered to allow her to telecommute from her home. She had worked set hours, first from 8:30-4:30 and later from 8:00-4:00. (Pl. Depo. at pp.38,  61 – 62).  Plaintiff knew of J&J's policy that "[p]unctual and regular attendance is an essential function of each employee's job at the Company.  Any tardiness or absence causes problems for fellow employees and supervisors." (Def. Ex. 3, Attendance Policy).  Likewise, Plaintiff knew that "excessive absenteeism (excused  or not) may be grounds for discipline up to and including termination." Id.  Plaintiff signed a document titled "Standard Points to be Covered Prior to Commencing Telecommuting" (Def. Ex. E signed Telecommuting Policy).  This document included many important requirements specific to telecommuting, and it expressly incorporated J&J's Employee Information Manual, including J&J's Telecommuting policy. (Def. Ex. F Tele-Commuting Policy 2-07).

In short, Plaintiff agreed to a specific work schedule; to report any absences or time-off to her supervisor; and to ensure that her internet connection was available and

8

operational. (Id.)  If any internet outage occurred, J&J's policy was that it was the employee's responsibility to secure a back-up location with working internet. (Id.) Moreover, Plaintiff agreed to be on site where necessary and to maintain service standards and production levels. (Id.)  Finally, J&J's policy specifically stated that "telecommuting arrangements are granted on a temporary and revocable basis, and may be discontinued by the Company at any time and for any reason." (Id.)  Plaintiff read and understood J&J's telecommuting policy. (Pl. Depo., p. 103, ll. 4 – 25).

Nevertheless, Plaintiff had performance problems as a telecommuter, i.e., she was unable to consistently maintain her internet connection and she had attendance deficiencies.  According to Plaintiff, she "usually" worked the required hours when she began telecommuting; however, she "spent a lot" of time working at night because J&J's system "had many glitches." (Pl. Depo., p. 104, l. 22 – p. 105, l. 3).  In January 2010, Cathy Parmley, (Parmley), Plaintiff's supervisor, wrote in Plaintiff's evaluation that her attendance still needed improvement.  In one peer review of Plaintiff, the peer indicated that Plaintiff only "[s]ometimes" followed through on assignments until completion and "[s]eldom" separated personal from professional life. (Jan. 2010 Peer Review, Def. Ex. G).   After Plaintiff had been telecommuting for nearly a year, she had not resolved her internet or attendance issues.  Parmley confronted Plaintiff regarding her lack of productivity, which Plaintiff acknowledged. (February 2010 e-mail exchange, Def. Ex. H).

Next, during the latter part of April and early May 2010, Plaintiff found out about her husband's "indiscretion." (Pl. Depo. p. 123, ll. 3 – 12).  Unfortunately  Plaintiff had a nervous breakdown as a result. (Id. ll. 14 – 16).  She spoke to Parmley about it and

Parmley advised her to apply for FMLA leave. (Pl. Depo., p. 124, l. 19 – p. 125, l. 25; p. 126, ll. 11 – 18).

On May 2, 2010, Plaintiff sent an e-mail to Lisa Kluczinsky, (Kluczinsky), J&J's human resources manager and copied Parmley, among others, including her daughter, Amanda Williams. (Email to Kluczinsky, Def. Ex. I).  In this e-mail, Plaintiff referenced her earlier conversation with Parmley, asked for FMLA leave, and requested that her daughter be J&J's point of contact during her leave of absence. Id.  According to Plaintiff, J&J and her daughter began communicating regarding her leave; J&J assured Plaintiff that she should feel free to take FMLA leave. (Pl. Depo. p. 127 – 128).  On May 6, 2010, Plaintiff submitted her official FMLA leave request, which was approved. (Plaintiff's FMLA leave request, Def. Ex. J; Pl. Depo. p. 129, ll. 22 – 24).

On June 10, 2010, Plaintiff's physician, Dr. James Way, wrote that he was treating her for depression and recommended that she continue working half-days at least until July 5, 2010. (Letter from Dr. Way, Def. Ex. K).  Plaintiff gave this letter to J&J and agreed it was consistent with the plan she and Parmley established for her in May. (Pl. Depo. p. 11– 23).

In late June and early July 2010, Plaintiff took a vacation. (Id. p. 134, ll. 3 – 4). She spoke with Parmley while on vacation and they discussed when Plaintiff planned to return to work full-time. (Id. p. 134, l. 24 – p. 135, l. 8).  Following up on this conversation, Parmley sent Plaintiff an e-mail welcoming her back from vacation and laying out Plaintiff's full-day work plan. (July 6, 2010, e-mail from Parmley, Def. Ex. L). Plaintiff agreed that when Parmley wrote this e-mail, she and Parmley anticipated she would return to work full-time when her vacation was over. (Pl. Depo. p. 135, ll. 5 – 8).

10

In a response e-mail to Parmley, Plaintiff wrote that she had a nice vacation, and noted that Dr. Way had changed her next appointment from July 5th to July 9th. (Def. Ex. L)

On July 9th, Plaintiff went to the follow-up appointment and provided J&J with a second letter from Dr. Way, which indicated that she should begin working three-quarter days for "no more" than two weeks, and then she should begin attempting full-time work. (Letter from Dr. Way Def. Ex. M; Pl. Depo. p. 133, ll. 7 – 18).  Plaintiff then attempted full-time work on August 2, 2010, consistent with Dr. Way's instructions. (Pl. Depo. p. 135, ll. 19 – 23).  Plaintiff had some bad days but agreed that J&J and Parmley helped her with the process; corresponded with her daughter, and never told her that she could not continue to take FMLA leave. (Pl. Depo. p. 136, l. 1 – p. 137, l. 2).

In August  2010, Dr. Way wrote that Plaintiff could work full time and her only restriction was that she "may require fewer work hours on some days, if overwhelmed." (Physician's Statement for Short-Term Disability, Def. Ex. N).  Plaintiff had been approved for short-term disability benefits, and received disability benefits from May 14, 2010, through August 2, 2010, the day she came back to work full-time. (Letter from Rebecca Rice, Lincoln Financial Benefit Specialist, Def. Ex. O).  Plaintiff received all her short-term benefits[1] and never submitted additional paperwork or applications to receive benefits beyond the August 2, 2010, start of full time work. (Pl. Depo. p. 143, l. 11 – p. 144, l. 24).

On September 24, 2010, Jonnie Berenguer, (Berenguer) who was then

---

[1] Plaintiff never applied for long-term disability. (Pl. Depo. p. 145, ll. 1 – 6).

supervising Plaintiff, responded to an e-mail from Plaintiff by telling her to "PLEASE not hesitate or be afraid to tell me if you are feeling overwhelmed so that we can make sure you are taking care of #1, which is you." (Def. Ex. P)(emphasis in the original). Berenguer told Plaintiff to take as much time away as needed and to let J&J know so that they could code it under FMLA so that Plaintiff would "not have to worry about making up any time or being negative with PTO." (Id.)

In sum, Plaintiff never requested additional FMLA leave, though she understood that she was to inform J&J if she needed additional FMLA leave. (Pl. Depo. p. 158, ll. 7 – 10). Likewise, Plaintiff never raised any concerns about FMLA time; never told anyone at J&J that she needed additional FMLA time and was never told by anyone at J&J that she could not take additional FMLA time. (Id. p. 158, ll. 11 – 19).

Beginning in late September 2010 and into early January 2011, Plaintiff was absent from work several times for reasons unrelated to her depression and was not disciplined for her absences in any way. On September 30, 2010, Plaintiff and Berenguer exchanged e-mails to clear up time-keeping issues related to times Plaintiff was not working. (Def. Ex. Q). Among these were absences for a flu-shot; her adult daughter's surgery; computer problems; and a visit at her home from a long-time friend. (Id.)

On October 1, 2010, Plaintiff sent an e-mail to Kluczinsky, Parmley and Berenguer, and attached a September 29, 2010, letter from Dr. Way regarding her depression and FMLA status. (Def. Ex. R, S). Dr. Way wrote that Plaintiff was continuing to work full-time but may need a few hours away when she felt overwhelmed. (Def. Ex. S). As before, Plaintiff confirmed that she did not make any

12

FMLA requests and that she was not denied the opportunity to work fewer hours when she felt overwhelmed. (Pl. Depo. p. 162, ll. 11-29).

On October 20, 2010, Plaintiff e-mailed Berenguer to inform her of appointments with Dr. Way and her family doctor. (Def. Ex. T). The following day, Plaintiff e-mailed Berenguer to update her on her doctors' appointments as well as a new appointment with her dentist. (Def. Ex. U). Berenguer had no problem with Plaintiff's schedule. (Pl. Depo. p. 164, l. 6-13). On November 9, 2010, Plaintiff e-mailed Kluczinsky, Parmley, Berenguer, and Ms. Gibson, another human resources employee, and attached an October 29, 2010, letter from Dr. Way, which Kluczinsky had requested. (Def. Ex. V and W). Dr. Way indicated Plaintiff had made "significant progress" but may still require "brief respite[s]." Plaintiff understood this to mean that she was continuing to work full-time and did so throughout the remainder of her employment. (Pl. Depo. p. 165, l. 19 – p. 166, l. 4). She never requested FMLA leave but she continued to have attendance problems.

The following communications are examples of attendance problems.

On January 2, 2011, Plaintiff e-mailed Berenguer to apologize for not finishing her day's tasks because she "was not expecting to have [her] house full" of relatives. (Def. Ex. X).

On January 4, 2011, Plaintiff asked if she can work through lunch to go to a chiropractor and told Berenguer of an upcoming appointment with Dr. Way. (Def. Ex. Y). Plaintiff apologized again for her performance. Plaintiff reported no issues with this time off request. (Pl. Depo. p. 168, ll. 9–11).

The following day Plaintiff e-mailed several of her co-workers. (Def. Ex. Z). The e-mail itself is blank with a subject line "Rebooting." Plaintiff sent this e-mail to everyone who telecommuted to let them know that her internet was down. (Pl. Depo. p. 170, ll. 4 – 10).

The next day, Plaintiff sent another e-mail "Had to reboot several times this

morning….anyone else having issues?" (Def. Ex. AA).  No other telecommuter
has issues. (Pl. Depo. p. 243, ll. 13 -15).
On January 12, 2011, Plaintiff e-mailed Berenguer tell her that she had to reboot
and that she was offline. (Def. Ex. BB).  Instead of driving to the office to work,
as she was required to do, Plaintiff left to "go run a few errands." (Id.).

On January 18, 2011, in response to a team-wide e-mail from Berenguer,

Plaintiff apologized for failing to turn in paperwork for her annual review and for failing

to clock-out the previous Friday. (Def. Ex. CC).  Plaintiff acknowledged that her

paperwork was late and deposed that she did not recall if she ever completed it. (Pl.

Depo. p. 172, l. 14–p. 173, l. 3).

On January 20, 2011, Plaintiff turned in her review paperwork and she received

a generally positive review from Berenguer the next day.  Berenguer agreed that the

review was meant to be positive since Plaintiff was doing better and feeling stronger.

(Feb. 14 e-mail notes of annual review from Berenguer to Kluczinsky, Def. Ex. EE).

The two also discussed Plaintiff's continuing  internet problems; Plaintiff explained that

she was transferring to a new system that she hoped would resolve the problem. (Id.)

Following the review, Plaintiff continued to work from home and her attendance

and internet connectivity problems continued as well.  Examples follow.

On January 23, 2011, Plaintiff did not complete her work because her older
sister was in the hospital with a knee infection. (Jan. 23 e-mail, Def. Ex. FF);

On January 25, 2011, Plaintiff needed someone to cover for her so she could
pick things up for her brother-in-law. (Jan. 25 e-mail, Def. Ex. GG);  Plaintiff
returned even later than she predicted. (Second Jan. 25 e-mail, Def. Ex. HH);

On January 28, 2011, Plaintiff left her work midday because "people are here to
work on garage heater and need to move the car and some other things" and did
not clock out of work  (Jan. 28 e-mail, Def. Ex. II; Pl. Depo. p. 179, ll. 21–22);

On January 24, 27, 28, and Feb. 1, Plaintiff sent e-mails to Berenguer regarding

14

her computer issues and rebooting. (Def. Ex. JJ);

On January 31, 2011, Plaintiff left her work midday to pick up her niece's daughter from school. (Def. Ex. KK);

On February 1, 2011, Berenguer e-mailed Plaintiff to tell her to turn her telephone on "standard" because a customer call to the Plaintiff rang into Berenguer's telephone. (Def. Ex.  LL);

On February 2, 2011, Berenguer emailed her "team" telling them that she had to answer calls from customers to Plaintiff for the afternoon because Plaintiff "had to leave unexpectedly." (Def. Ex. MM).

On February 4, 2011, Berenguer emailed Parmley and Kluczinsky, "Just wanted to give you an update on Sarah. She left the chiropractor at 11:14 and returned at 11:35. She responded to my email that I sent at 2:00 at 3:40 to tell me that she was at lunch from 1:00 until 2:00 and then couldn't get connected to the phone until 3:40." (Def. Ex. NN).

Several days before Plaintiff was fired, Berenguer and Kluczinsky spoke to Plaintiff about wanting to have Plaintiff return to her work at the office rather than telecommuting. (Kluczinsky Depo. p. 87, l. 22 – p. 88, l. 16, Def. Ex. OO).  Plaintiff told them that she did not want to return to the office and said that she would "do anything" to continue telecommuting. (Id. p. 87, l. 22 – p. 88, l. 9).  Plaintiff said "that she had no desire to work in the office, that she did not like the atmosphere, and that she was totally uncomfortable in the office, ... ."  Id.

On February 9, 2011, Plaintiff and Parmley had a meeting with Kluczinsky and Berenguer who were participating by conference call. (Pl. Depo. p. 186, ll. 11 – 15).  At this meeting, Plaintiff's employment was terminated.  Plaintiff deposed that she was told that "she was not growing as fast as the company," (Pl. Depo. P. 186), and the Defendant reported that the termination decision was made because of Plaintiff's poor performance, network/telecommuting issues, and because she was simply unable to

15

maintain normal business hours. (Summary of Termination provided to South Carolina
Department of Employment Commission, Def. Ex. PP).

### Discussion

A review of the record and relevant case law reveals that the Defendant's
summary judgment motion should be granted.

Plaintiff has shown that she had exercised a protected right under the FMLA
because she applied for and was granted intermittent leave, and that she had a
disability under the ADA.  In addition, Plaintiff was adversely affected by an
employment decision when her employment relationship was terminated.
Nevertheless, Plaintiff's inability to forecast competent evidence that the fact that she
had a disability and took FMLA leave caused her termination is fatal to defeating
Defendant's well supported summary judgment motion. McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802 (1973), 411 U.S. 792, 802 (1973); Mercer v. Arc of Prince
Georges County, Inc., 532 F. App'x 392, 398 (4th Cir. 2013) (outlining elements of a
prima facie case of retaliatory discharge.)

Plaintiff has no direct evidence of causation.  It appears that Plaintiff's
circumstantial evidence is basically that: I was not fired before I took FMLA leave for my
disability.  I was fired after I took FMLA leave for my disability.  Therefore, the
Defendant must have had retaliatory animus toward me for taking FMLA leave, which
animus must have caused the Defendant to terminate my employment.  That vague
temporal proximity is simply not enough to require a finder of fact to determine if she
would not have been fired but for her having a disability and having taken FMLA leave.

The temporal proximity between the time of Plaintiff's return to full time work on

16

August 2, 2010, and her termination on February 9, 2011, is too attenuated to support the required inference. Even if one assumed that the date she was able to return to full time work was October 29, 2010, the time period is still just too long.

Both the Supreme Court and the Fourth Circuit have held as a matter of law that such a lapse of time between protected activity and the adverse employment action is insufficient to establish causation. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (finding a 20 month delay too long to establish a causal connection and noting cases that found three-to-four-month delays too remote to establish causation based on temporal proximity); cf. King v. Rumsfeld, 328 F.3d 145, 151 n. 5 (4th Cir. 2003) (noting a delay of two months and two weeks long can be enough to *weaken* significantly the inference of causation between the two events); Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (finding that three months is too remote); Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that causation can be shown by very close temporal proximity, but holding that three to four months is not close enough). It appears that Plaintiff has not borne her burden to show causation and, therefore, has not established a prima facie case of ADA or FMLA retaliatory discharge.

Furthermore, nothing in the record evidence gives rise to an inference of pretext in any of the decisions the Defendant made with respect to Plaintiff's employment, or demonstrates a retaliatory animus on the part of the Defendant. While Plaintiff obviously believes she was dealt with unfairly, and indeed the undersigned makes no finding as to whether her termination was appropriate, Plaintiff has provided no evidence to carry her burden to demonstrate that the real reason she was subjected to

17

the adverse employment action was because she engaged in activity protected by the ADA or the FMLA except her own general and conclusory allegations.  Plaintiff may not create a genuine issue of fact through mere speculation or the building of one inference upon another.

Moreover, during her deposition, Plaintiff could not provide the name of another employee who was treated differently from her or anyone that ever received preferential treatment. (Pl. Depo., p.188, ll. 9 – 17).  Thus, Plaintiff has provided no evidence that she was treated less favorably than similarly situated employees.  The lack of comparator evidence further supports the entry of summary judgment.  In Laing v. Federal Exp. Corp., 703 F.3d 713, 719 (4th Cir. 2013), the Fourth Circuit emphasized that "'especially relevant' to a showing of pretext [is] evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." Id. at 719.  Courts "routinely rely on comparator evidence when deciding whether an adverse employment action was driven by a discriminatory motive." Id. (citations omitted).  Comparator evidence is critical in deciding discrimination cases because the very meaning of "discrimination" encompasses "the notion of treating two persons differently on the basis of certain characteristics that only one possesses." Id.  Without a comparator, no such analysis can take place. Id. at 720.

Next, Plaintiff's breach of contract cause of action is also subject to judgment as a matter of law.  Plaintiff cannot make out her claim against J&J for breach of contract because she did not have an employment contract with J&J.  South Carolina is an employment at-will state in which employment is terminable at the will of either party. Shealy v. Fowler, 188 S.E. 499, 502 (S.C. 1936); Jones v. General Electric Co., 503

18

S.E.2d 173, 177 (S.C. Ct. App. 1998).  Under the doctrine of employment at-will, an employer may lawfully discharge an employee "at any time, for any reason or for no reason at all." <u>Prescott v. Farmers Telephone Coop. , Inc.</u>, 516 S.E.2d 923, 925 (S.C. 1999); see also <u>Culler v. Blue Ridge Elec. Coop., Inc.</u>, 422 S.E.2d 91, 21 (S.C. 1992) (noting that the employment at-will doctrine "allows an employer to discharge an employee without incurring liability for good reason, no reason, or bad reason"). Plaintiff generally states that J&J's employee handbook created a contract with her, but she cannot identify any specific part of J&J's handbook to support her claim. Specifically, when asked to identify any section of the handbook she claimed constituted a contract, she stated, "I cannot." (Pl. Depo. p. 190, ll. 17 – 21).  Plaintiff cannot articulate any specific policy or procedure that established a contract between herself and J&J because none exists.

Importantly, the South Carolina Supreme Court has held that if policy language does "not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired" then an employee's breach of contract claim based upon a handbook or policy manual fails as a matter of law. <u>Hessenthaler v. Tri-County Sister Help, Inc.</u>, 616 S.E.2d 694 (S.C. 2005) (nondiscrimination policies in a handbook are legally insufficient to sustain a breach-of-contract claim).  Under these circumstances, the Defendant is entitled to summary judgment on the Plaintiff's claim for breach of contract.

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended the Defendant's

motion for summary judgment be granted,

**IT IS SO RECOMMENDED**.

August 22, 2014
Charleston, South Carolina

WALLACE W. DIXON
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).